**In re CITIGROUP, INC. SECURITIES LITIGATION,**

**No. 02CIV.5779(LTS)(RLE).**

United States District Court,
S.D. New York.

Aug. 10, 2004.

Milberg Weiss Bershad & Schulman LLP by Melvin I. Weiss, Esq., Sanford P. Dumain, Esq., Christian Siebott, Esq., Ann M. Lipton, Esq., New York City, Lead Plaintiffs' Counsel.

Paul, Weiss, Rifkind, Wharton & Garrison LLP by Richard A. Rosen, Esq., Brad S. Karp, Esq., Mark F. Pommerantz, Esq., Michael E. Gertzman, Esq., Claudia L. Hammerman, Esq., Jonathan H. Hurwitz, Esq., New York City, for Defendants.

## OPINION AND ORDER

SWAIN, District Judge.

Pompano Beach Police & Firefighters Retirement System ("Plaintiff"), which has been designated as lead plaintiff pursuant to 15 U.S.C. § 78u–4, brings this putative class action on behalf of purchasers or those who otherwise acquired securities of Citigroup, Inc. ("Citigroup"), from July 24, 1999, to December 11, 2002, asserting claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5, against: Citigroup; its chairman and chief executive officer, Sanford I. Weill ("Weill"); its chief financial officer, Todd S. Thomson ("Thomson"); its wholly-owned investment banking subsidiary, Salomon Smith Barney Holdings,

Inc. ("SSB"); the former chairman and chief executive officer of SSB and of Citigroup's Global Corporate & Investment Bank, Michael A. Carpenter ("Carpenter"); and former SSB stock analyst Jack Grubman ("Grubman" and, collectively, "Defendants"). Plaintiff also asserts claims under section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), against Weill, Thomson, and Carpenter. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.

Plaintiff claims that, with respect to transactions with Enron Corporation ("Enron"), Dynegy Inc. ("Dynegy"), and Worldcom Inc. ("Worldcom"), Defendants failed to conduct Citigroup's business in accordance with the risk management policies detailed in its public disclosures and omitted certain financial information or made affirmative misrepresentations relating to Citigroup, and that Defendants thereby violated the antifraud provisions of the securities laws in connection with the purchase and sale of Citigroup securities. Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Complaint[1] for failure to state a claim and, pursuant to Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(b), on the grounds that fraud is not adequately pleaded in the Complaint. The Court has considered thoroughly the arguments and submissions of the parties in connection with this motion. For the reasons that follow, Defendants' motion to dismiss is granted.

## BACKGROUND

Plaintiff's principal material allegations can be summarized as follows. The summary takes as true Plaintiff's allegations

---

**1.** All citations to the Complaint herein refer to the Amended Consolidated Class Action Complaint, filed March 10, 2003.

and undisputed factual assertions, but does not in any way constitute factual findings by the Court. Lead Plaintiff Pompano Beach Police & Firefighters' Retirement System is an investor that purchased shares of Citigroup stock during the class period; Plaintiff claims that the stock was priced artificially high during the relevant period. (Compl. ¶ 32.) Defendant Citigroup is a publicly-traded financial services institution that provides, through its subsidiaries and divisions, commercial and investment banking and brokerage services. (*Id.* ¶ 33.) Defendants Weill, Thomson, and Carpenter were directors and officers of Citigroup at all relevant times. (*Id.* ¶¶ 34, 35, 37.) Weill and Thomson signed Citigroup's Report on Form 10–K for 1999, 2000, and 2001. (*Id.* ¶¶ 34, 35.) Thomson also signed Citigroup's Reports on Form 10–Q for the periods ending March 2000, June 2000, September 2000, March 2001, June 2001, and September 2001. (*Id.* ¶ 35.) Carpenter signed SSB's Reports on Form 10–K for 1999, 2000, and 2001. (*Id.* ¶ 37.) Defendant SSB, a wholly-owned subsidiary of Citigroup, is a retail brokerage, investment banking, and asset management firm. (*Id.* ¶ 36.) Defendant Grubman was a stock analyst at SSB during the relevant period and resigned in August 2002. (*Id.* ¶ 38.)

### Risk Management

As a financial institution, Citigroup depends on its reputation for risk management. Citigroup made several policy statements concerning its approach to risk management in its Reports on Form 10–K. (*Id.* ¶¶ 55–60.) For example, Citigroup declared that:

> Risk management is the cornerstone of Citigroup's business. Risks arise from lending, underwriting, trading, insurance and other activities routinely undertaken on behalf of customers around the world ...

> The review of the risk profile covers ... *Credit risk ratings, including trends in client creditworthiness* .... Limits assigned to relationship concentrations ... Distribution and underwriting risk, capturing the risk that arises when Citigroup commits to purchase an instrument from an issuer for subsequent resale; Corporate Control and Risk Assessment, evaluating and measuring defects in our business processes; ... *Legal, evaluating vulnerability and business implications of legal issues* ...

(*Id.* ¶ 57 (quoting Citigroup's 1998 Report on Form 10–K, filed March 8, 1999)) (emphasis in Complaint). Similar statements were included in Citigroup's public filings in 2000, 2001, and 2002. In the 10–K Reports, Citigroup also described various risk management-related procedures, such as those governing extensions of credit. (*Id.* ¶¶ 63–65.)

### Enron

Enron is an energy company formed in 1985 through the merger of two pipeline companies. (*Id.* ¶¶ 70–71.) Before Enron declared bankruptcy in December 2001, it accounted for 25 percent of all United States energy trades and was a major Citigroup client. (*Id.* ¶ 70.) Enron's revenues climbed steadily in the late 1990's and reached a year-end high in 2000 of $100 billion. (*Id.* ¶ 72.) Because Enron consistently reported earnings that surpassed expectations, it had an investment-grade credit rating, and its share prices remained high throughout that period. (*Id.*) Enron's high credit rating allowed it to borrow billions of dollars in the commercial paper market and to sell debt securities to the public. (*Id.* ¶ 73.) In 2001, Enron began to reveal that its accounting reports were fraudulent; in October 2001, Enron announced that it intended to take

a charge of $1 billion and reduce shareholders' equity by $1.2 billion.

Citigroup entered into a variety of lending and investment transactions with Enron, and, according to Plaintiff, was aware that Enron's financial statements were inflated because Citigroup was the originator of several of the investment schemes and structures. (*Id.* ¶¶ 113–14.) Citigroup was also aware of Enron's finances because, as a lender and an underwriter of Enron securities, Citigroup was required to perform credit analyses. (*Id.* ¶¶ 115, 116, 247.) Moreover, because Citigroup was competing with other banks to provide Enron with off-balance sheet financing, Citigroup was aware of Enron's off-balance sheet liabilities. (*Id.* ¶ 119.)

*Special Purpose Entities*

One major facet of Citigroup's relationship with Enron was Citigroup's assistance to Enron in establishing special purpose entities ("SPEs"), Enron subsidiaries whose finances Enron omitted from its balance sheets through a series of fraudulent accounting procedures. Citigroup's assistance included, among other things, structuring the subsidiaries and providing loans to fund them. (*Id.* ¶¶ 122–129.) Plaintiff asserts that the SPEs allowed Enron to avoid listing various debts on its balance sheets and thus enabled Enron to report inflated earnings figures. The Complaint identifies several iterations of such SPEs, all of which are alleged to have constituted mechanisms by which Citigroup assisted Enron in staving off its burgeoning debt.

*Disguised Loans*

Plaintiff further alleges that Citigroup also acted in the role of lender to Enron, in certain transactions exceeding the internal limits Citigroup usually applied to a "buyer" [sic] with Enron's triple-B credit rating; for instance, as of the first quarter of 1999, although Citigroup had an internal limit for Enron of $375 million, Citigroup

allegedly had outstanding credit exposure with Enron of $1.668 billion. (*Id.* ¶¶ 148–49.) During the relevant period, Citigroup provided to Enron at least an additional $4.8 billion in what Plaintiff refers to as "disguised loans". (*Id.* ¶¶ 149, 153.) In so doing, Citigroup was able to charge Enron substantial fees for Citigroup services and at the same time encourage investments in Enron that would generate funds with which Enron could pay off its debt to Citigroup. (*Id.*) Citigroup's disguised loans to Enron were often misreported in Citigroup's financial statements, creating a situation in which Citigroup's outstanding loans were understated in public filings and interest income was not properly classified. (*Id.* ¶ 156.) Loans also were not properly reported in Federal Reserve filings; the Federal Reserve has initiated investigations into various Citigroup transactions with Enron. (*Id.*)

Citigroup also engaged in prepaid swaps, a particular type of disguised loan in which transactions that were essentially loans were recorded as commodity trades for accounting purposes in violation of generally accepted accounting principles ("GAAP"). (*Id.* ¶¶ 157–66, 170.) By 2001, Citigroup had outstanding prepaid swaps with Enron amounting to at least $2.4 billion. (*Id.* ¶ 174.) One such transaction, known as Yosemite, was created to lend $800 million to Delta, an Enron SPE; although booked as a trade in Citigroup's accounting, Yosemite was structured to maximize interest payments to Citigroup and was essentially a loan to Enron. (*Id.* ¶¶ 160–166.) The accounting practices underlying these transactions, as with other prepaid swaps, were not disclosed to investors. (*Id.* ¶ 172.) In addition, because Citigroup itself held several Yosemite bonds, Citigroup was left with unsecured exposure to Enron's debt. (*Id.* ¶ 183.) Citigroup further violated its risk management policies by creating inadequate loan

loss reserves to compensate for Enron's debt levels. (*Id.* ¶ 176.)

This scheme of prepaid swaps and other disguised loans violated Enron's borrowing limits with Citigroup and exposed Citigroup to potential regulatory action from the Securities and Exchange Commission ("SEC"), the Department of Justice, and the Federal Reserve, as well as to lawsuits from investors claiming to have been defrauded by the Yosemite bond offerings. (*Id.* ¶ 186.) Citigroup did not disclose the prepaid swaps as outstanding loans in its SEC filings or its Annual Reports to Shareholders. (*Id.* ¶ 187.)

Various Citigroup officials were aware of the Delta/Yosemite transactions, and Citigroup's Investment Grade Debt Committee reviewed the terms of the transactions. (*Id.* ¶¶ 189–90.) In fact, Weill promoted the Yosemite deals and their structure as a symbol of the success of the SSB/Citicorp merger, although he later claimed in a Senate investigation that he had no "personal knowledge" of transactions like Delta. (*Id.* ¶¶ 191, 194.) Similarly, a communication from Weill to Citigroup executives, known as the "Weill Memo," referred to the "Bacchus" series of transactions (a series of loans disguised as sales of Enron assets) and explained how they were created to act as protective measures to safeguard Citigroup's investment in Enron. (*Id.* ¶¶ 197–209.)

In addition to disguised loans, Citigroup, in tandem with Chase, created syndicated loans whereby Citigroup and Chase guaranteed loans to Enron, and other banks purchased portions of Enron's credit risk from Citigroup. (*Id.* ¶ 236.) Through syndicated and other types of loans, and in violation of its internal loan limits, Citigroup loaned Enron and/or its affiliates over $4 billion in 1999, $5.5 billion in 2000, and almost $4 billion in 2001. (*Id.* ¶ 223.) Throughout this period, Citigroup failed to disclose to its investors that Enron's balance sheets were grossly inflated. (*Id.* ¶¶ 237–41.)

In November 2001, Citigroup and Chase also provided improperly secured loans, of which Citigroup contributed approximately $600 million, to Enron subsidiaries. (*Id.* ¶ 242.) The loans to the subsidiaries were secured by interests in the subsidiaries' gas pipelines; the subsidiaries then lent the money to Enron in exchange for an uncollateralized "I.O.U." (*Id.*) Enron also transferred back to the subsidiaries $250 million, which was applied to retire an earlier unsecured loan from Citigroup to Enron. (*Id.* ¶ 244.) Enron declared bankruptcy a few days after these loan transactions were completed. (*Id.* ¶ 243.) The timing and structure of the transactions exposed Citigroup to the risk of forced disgorgement of the $250 million and avoidance of the security interest in bankruptcy court. (*Id.* ¶ 243.) Citigroup announced in January 2002 that its exposure to Enron debt was $1.1 billion, including $650 million secured by the interests in the Enron subsidiaries' gas pipelines, about which Weill reportedly said he felt "very comfortable." (*Id.* ¶ 246.) Citigroup failed to disclose the risks inherent in this loan transaction.

*Dynegy and Worldcom*

The Complaint further alleges that Citigroup structured disguised loans to Dynegy in much the same way it did with Enron. As with the Enron loans, Citigroup recorded loans to Dynegy as derivative trades and created inadequate loan loss reserves. (*Id.* ¶ 256.) Citigroup structured a series of transactions with Dynegy known as Project Alpha, using a system of gas trades to augment Dynegy's cash flow by $300 million and reduce Dynegy's tax bill by $80 million. (*Id.* ¶ 253.) Similar to some of the Enron transactions, the scheme made use of SPEs, loans, and

hedging transactions, and Citigroup was eventually investigated by the SEC for its role in structuring the project. (*Id.* ¶¶ 254–55.) SSB analysts maintained a "buy" recommendation with respect to Dynegy stock until Project Alpha was disclosed in an April 2002 *Wall Street Journal* article, all the while knowing that Dynegy's financial statements were inflated. (*Id.* ¶ 256.)

The Complaint notes that, according to an October 2002 class action complaint in another lawsuit, Citigroup and SSB are alleged to have kept the price of Worldcom stock artificially inflated through, among other things, disguised loans to Worldcom CEO Bernard Ebbers. (*Id.* ¶ 258.) Moreover, SSB analyst Jack Grubman continued to urge investment in Worldcom during the class period from 1999 to 2002, even though Worldcom's stock was on the decline. (*Id.* ¶¶ 256–65.)

*SSB Analysts*

SSB analysts were overly bullish in their recommendation of certain stocks, such as Enron and Worldcom, due to undisclosed conflicts of interest arising from Citigroup's investment banking relationships with the stock issuers. (*Id.* ¶¶ 267–370.) Moreover, the SSB analysts' compensation was tied to Citigroup's investment banking revenue, as Citigroup admitted in its discussion of Grubman's compensation in an August 7, 2002, letter to the House Committee on Financial Services. (*Id.* ¶¶ 294, 298, 301.) Grubman's personal ties to investment banking clients and his lack of willingness to downgrade his ratings of their stocks were particularly notable. (*Id.* ¶¶ 302–04.) For instance, Grubman encouraged the purchase of certain telecommunications stocks in exchange for banking business. (*Id.* ¶¶ 311–14.) Citigroup requested Grubman's resignation in August 2002. (*Id.* ¶ 320.)

## DISCUSSION

In deciding a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must accept as true the material facts alleged by the plaintiff and draw all reasonable inferences in the plaintiff's favor. *Grandon v. Merrill Lynch,* 147 F.3d 184, 188 (2d Cir. 1998). The court must not dismiss the complaint unless " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000).

Having considered carefully the claims asserted in the Complaint, the Court finds that it is beyond doubt that Plaintiff can prove no facts in support of its claims that would entitle it to relief. Accordingly, for the reasons explained below, the Complaint will be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The Complaint also fails to satisfy the pleading requirements of both Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b) provides that "[in] all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). The PSLRA specifically requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" and that, with regard to a misstatement or omission of material fact, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement is made on information and belief, the complaint shall state with particularity all facts on which that belief is

formed." 15 U.S.C.A. § 78u–4(b) (West 1997).

*Failure to State a Claim upon which Relief Can be Granted*

Plaintiff claims that Defendants violated section 10(b) of the 1934 Act and related provisions of federal securities law in two principal respects: by structuring commodities and other financial transactions with Enron and other entities that permitted those entities to disguise debt on their books, with Citigroup carrying the transactions on its own books as equity investments rather than extensions of credit; and by permitting Defendant Grubman and other SSB analysts (who purported to give investors in Citigroup's investment banking clients objective assessments of securities issued by those clients) to color those assessments in aid of building up Citigroup's investment banking business. Plaintiff alleges that the former activity supports a section 10(b) claim because the risks inherent in participating in allegedly illegal and deceptive conduct with Enron and other companies, as well as the effect disclosure of the transactions as loans would have had on Citigroup's balance sheet, rendered misleading Citigroup's public disclosures regarding its risk management policies during the class period. The latter activity, according to Plaintiff, rendered misleading Citigroup/SSB's disclosures concerning the profitability of its investment banking activities and its implicit representations that such revenues were "sustainable."

■ "To state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001) (internal quotation omitted). The fraudulent conduct must involve an element of manipulation or deception. *See*

*Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). "Manipulation is 'virtually a term of art when used in connection with the securities markets' . . . . The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* at 476, 97 S.Ct. 1292 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

■ Even taking as true Plaintiff's claims that Citigroup and its defendant officers knowingly participated in the structuring of transactions designed to mislead investors in Enron and other companies as to the true financial status of those companies, and that Citigroup improperly carried the transactions on its own books as equity investments rather than loans, Plaintiff's section 10(b) claim here—that participation in such transactions was inconsistent with Citigroup's stated risk management policies and historical business practices—amounts to nothing more than a charge that Citigroup's business was mismanaged. Such allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim under section 10(b).

The principle that a claim of securities fraud cannot lie based on mismanagement alone was firmly established by the Supreme Court in *Santa Fe Industries.* The plaintiffs in that case charged that the defendant majority shareholders had falsely manipulated the valuation of the company's assets in connection with a tender offer (in which company shareholders who were dissatisfied with the offer had a right to an appraisal of their stock) and argued that the majority's breach of fiduciary duty

supported a section 10(b) claim. The underlying asset appraisals had been disclosed to shareholders. *Id.* at 467, 97 S.Ct. 1292. Finding no element of deception or manipulation in the alleged conduct, the Supreme Court held that the claim was outside the ambit of the antifraud provisions of the securities laws: "we do not think [Congress] would have chosen th[e] 'term of art' ['manipulation'] if it had meant to bring within the scope of 10(b) instances of corporate mismanagement ... in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary." *Id.* at 477, 97 S.Ct. 1292. " '[C]ongress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.' " *Id.* at 479, 97 S.Ct. 1292 (quoting *Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971)). Facts that require a court " 'to distinguish between conduct that is reasonable and unreasonable, or informed and uninformed, [involve] distinctions that are the hallmark of state fiduciary law,' and therefore 'allegations of garden-variety mismanagement' are not actionable under section 10(b)." *Ciresi v. Citicorp,* 782 F.Supp. 819, 821 (S.D.N.Y.1991) (quoting *Field v. Trump,* 850 F.2d 938, 948 (2d Cir.1988) (internal quotation omitted)).

Plaintiff's claims are similarly qualitative, focusing not on specific factual or opinion disclosures alleged to have been false or misleading, or on omissions of specific facts, but rather on Plaintiff's contention that Citigroup's business would have been conducted differently had the company adhered to the management principles disclosed in its public filings. In the Complaint, Plaintiff thus quotes at length from Citigroup's descriptions of its risk management policies and processes, and from Citigroup's identification of risk management as a core element of its business. (Compl.¶¶ 57–60.) Arguing that Citigroup knew or should have known that Enron was in financial trouble, Plaintiff asserts that Citigroup's business relationships with Enron put it at undue credit risk and also exposed it to litigation and regulatory risks at odds with the risk management policies described in Citigroup's public filings.

More specifically, Plaintiff alleges that Citigroup ignored its own lending limits on extensions of credit to Enron, that Citigroup did not properly create loan loss reserves, both to account for Enron's lack of creditworthiness and to account for loans that had been booked as derivative trades, that Citigroup improperly accepted verbal guarantees for loan repayments, and that Citigroup accepted assets with no independently ascertained value as collateral. (*Id.* ¶ 250.) While such allegations may demonstrate that Citigroup engaged in risky transactions, they do not rise to the level of depicting manipulative or deceptive conduct within the meaning of the securities laws. *Cf. Ciresi,* 782 F.Supp. at 821 (rejecting, as relating to mismanagement, federal securities law claim based on alleged failure to maintain adequate loan loss reserves and extension of high-risk loans).

Even Plaintiff's allegation that the credit approval process for the Sundance SPE facet of the Bacchus series of transactions violated a specific risk management policy disclosed in Citigroup's public filings is, at bottom, a mismanagement claim. Plaintiff's claim is premised on the proposition that the Sundance transaction should have been treated as a loan rather than as an equity transaction because, as a loan, it would have been subject to the policy. Failure to process a transaction in a manner consistent with Plaintiff's view of the proper application of stated management policies is a far cry from the sort of fraudulent or manipulative conduct contemplat-

ed by section 10(b) and related provisions of federal law. It also bears noting that the risk management policy disclosures upon which Plaintiff relies did not purport to guarantee that Citigroup would not expose itself to risks. Indeed, the Complaint quotes a passage advising investors that "[r]isks arise from lending, underwriting, trading, insurance and other activities routinely undertaken on behalf of customers around the world." (Compl.¶ 57.)

The securities laws were not designed to provide an umbrella cause of action for the review of management practices, nor is "fraud by hindsight" a viable basis upon which to challenge management practices that ultimately result in losses. *See Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978). Rather, a plaintiff must allege deceptive or manipulative conduct in connection with transactions in the securities the plaintiff purchased or sold. Although the Complaint alleges falsification in reporting with respect to Enron securities, and that SSB analysts provided misleading information regarding the value of securities of Citigroup's investment banking clients, Plaintiff fails to allege such activity in connection with the market for Citigroup's own securities. Plaintiff's claims thus fail to state a cause of action under section 10(b) upon which relief can be granted.

Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from "unsustainable and illegitimate sources" violated section 10(b) is likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing. *In re Am. Express Co. Shareholder Litig.*, 840 F.Supp. 260, 269–70 (S.D.N.Y.1993) (company not required to "accuse itself of antisocial or illegal policies") (quoting *GAF Corp. v. Heyman*, 724 F.2d 727, 740 (2d Cir.1983)); *see also In re Donna Karan Int'l*, No. 97–CV–2011 (CBA), 1998 WL

637547, at *10 n. 9 (E.D.N.Y. Aug. 14, 1998) (quoting *Ballan v. Wilfred Am. Educ. Corp.*, 720 F.Supp. 241, 249 (E.D.N.Y.1989)) ("... securities laws do not require corporate management 'to direct conclusory accusations at itself or to characterize its behavior in a pejorative manner.'"); *Ciresi*, 782 F.Supp. at 823 ("... the law does not impose a duty to disclose uncharged, unadjudicated wrongdoing or mismanagement.").

Plaintiff's claims that Citigroup violated the securities laws by allegedly incurring, and not disclosing, litigation risks associated with its Enron-related, analysis/investment banking and reporting activities also fail to state a claim under section 10(b). (*See* Compl. ¶¶ 147, 237–41.) Citigroup was not required to make disclosures predicting such litigation. *In re Ford Motor Co. Sec. Litig.*, 184 F.Supp.2d 626, 633 (E.D.Mich.2001) (finding that company was not obligated to disclose information about possible recall of tires because there is "no duty to disclose predictions that are not substantially certain to hold."); *see, e.g. Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir.1995) (no duty to disclose possible future inspection by regulatory agency). Despite Plaintiff's characterizations of Citigroup's transactions as unduly risky or noncompliant with regulatory requirements, Plaintiff does not allege that the litigation to which it refers was substantially certain to occur during the relevant period. Moreover, Plaintiff acknowledges that Citigroup discussed pending litigation against the company in its report on Form 10–Q for the third quarter of 2002. (Compl. ¶ 62 (noting disclosure that Citigroup was named as a defendant in other class action lawsuits related to transactions with Enron and that Grubman and SSB were named as defendants in other securities actions).) Defendants'

failure to disclose all possible future litigation is not actionable under section 10(b).

Plaintiff's section 10(b) claim, insofar as it is premised on the assertion that Citigroup breached a duty to disclose that its revenues were "unsustainable," also fails to state a claim upon which relief can be granted. Plaintiff points to no projections or future predictions in the challenged disclosure documents; rather, Plaintiff argues that Citigroup's reporting of revenue figures implicitly represented that such results would continue. Arguing that Citigroup knew that its conduct was fraudulent, Plaintiff asserts that Citigroup had a duty to speak because its failure to do so was misleading. (*See* Pltf. Mem. of Law in Opp'n, at 29 (citing *In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F.Supp. 668 (S.D.N.Y.1990))). Plaintiff's reliance on *Par Pharmaceutical*, however, is misplaced because in that case, the court found that the defendants had made specific projections of continued success based on purported expertise in obtaining approvals from the Food and Drug Administration, while knowing that the success was attributable to bribery. *Par Pharmaceutical*, 733 F.Supp. at 678. Plaintiff here cites no such projections or revenue predictions by Citigroup. It bears noting that the *Par Pharmaceutical* court rejected a contention that the defendants had a duty to speculate about the effects of discovery of the bribery scheme on the company's future prospects. *Id.*

■ Plaintiff's section 10(b) claim also fails to the extent it is premised on Citigroup's alleged failure to comply with GAAP in its financial disclosures, for at least two reasons. The GAAP provision cited is a general conceptual statement relating to the significance and interpretation of historical financial information. (Compl.¶ 417.) Like Plaintiff's claims relating to alleged failure to comply with Citigroup's own risk management policies,

the GAAP violation claim is fundamentally one challenging Citigroup's management of its financial reporting function and does not allege the sort of fraudulent or deceptive conduct that is actionable under section 10(b). Furthermore, GAAP violations standing alone are insufficient to support a section 10(b) cause of action. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000) ("Only where [allegations of GAAP violations] are coupled with evidence of 'corresponding fraudulent intent' ... might they be sufficient.") (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir.1996)).

*Materiality*

■ Only false statements or omissions of material facts are actionable under the antifraud provisions of the securities laws. *See Kalnit*, 264 F.3d at 139. In order for information to be considered material, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Acito*, 47 F.3d at 52 (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Notwithstanding Plaintiff's detailed allegations regarding the specifics of Enron-related and similar transactions, Plaintiff fails to proffer facts supporting an inference that the transactions complained of were material in the context of Citigroup's overall business. Even if, for instance, a particular transaction did violate a Citigroup risk management policy, it is not a foregone conclusion that such knowledge would alter the "total mix" of information available to the reasonable investor. Nor has Plaintiff alleged facts from which a rational jury could conclude that a reasonable investor would have viewed as material Citigroup's disclosure on an equity basis of financial information relating to transac-

tions that Plaintiff contends were extensions of credit.

### Rule 9(b) and Related Issues

■ The Complaint must also be dismissed because Plaintiff has failed to plead its allegations of fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. The Second Circuit has interpreted Rule 9(b) to require that a complaint making allegations of fraud must (1) specify the fraudulent statements; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent.[2] The Complaint must also conform to the strictures of the PSLRA, which requires in relevant part that "the complaint shall specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."[3]

■ Plaintiff quotes extensively from Citigroup's descriptions of its risk management policies in the Complaint, but never specifies which of these descriptions constitutes a false or misleading statement or how (with the exception of the allegations regarding entry into an Enron transaction that did not receive allegedly requisite internal approvals[4]) each risk management policy quoted in the Complaint was violated. Many of the risk management passages quoted in the Complaint describe processes. Plaintiff alleges neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed. Rather, Plaintiff makes more general allegations, such as that Citigroup extended increasingly more credit to an "unstable borrower" [Enron]. (Compl.¶ 147.) Such generalized allega-

tions are insufficient to satisfy the requirements that allegedly fraudulent statements and omissions, and the reasons why they are alleged to be fraudulent, be identified with particularity.

### Scienter

■ Plaintiff also fails adequately to plead facts supporting the scienter element of its securities fraud claims.

'To state a cause of action under section 10(b) and Rule 10b–5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff injury.' *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996) (citing *In re Time Warner Secs. Litig.*, 9 F.3d 259, 264 (2d Cir.1993)) .... The requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5, that the plaintiff must allege is " 'an intent to deceive, manipulate or defraud.' " *Ganino [v. Citizens Utils. Co.]*, 228 F.3d [154,] 168 (2d Cir. 2000) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

*Kalnit*, 264 F.3d at 138. Plaintiff's allegations in this connection must be tested as well against the heightened pleading standards set by Rule 9(b) of the Federal Rules of Civil Procedure and section 78u–4(b)(2) of the PSLRA. As previously noted, Rule 9(b) requires that fraud be plead with particularity. The Second Circuit historically construed Rule 9(b) to require that, in pleading scienter,

'[P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite 'strong inference'

---

2. *Novak,* 216 F.3d at 306.

3. 15 U.S.C.A. § 78u–4(b)(1).

4. *See* Compl. ¶ 218.

of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.' "

*Novak*, 216 F.3d at 308. The PSLRA requires that a plaintiff, "with respect to each act or omission alleged to violate [section 10(b) ], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C.A. § 78u4(b)(2). The Second Circuit has concluded that "the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement)." *Novak*, 216 F.3d at 310.

The Complaint is devoid of facts indicative of an intent to defraud Plaintiff and other Citigroup shareholders in connection with transactions in Citigroup or SSB securities.[5] The facts Plaintiff characterizes as direct evidence of scienter,[6] including an internal memorandum citing the "importance of th[e Enron] relationship to [a Citigroup unit]" in relaying a request for support of a loan transaction,[7] are indicative, rather, of motives common to all corporations and their insiders. Securities fraud "[p]laintiffs [cannot] proceed based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating ... or otherwise sustain 'the appearance of corporate profitability, or of the success of an investment,' ... and (2) the desire to maintain a high stock price in order to increase executive compensation ... or prolong the benefits of holding corporate office." *Novak*, 216 F.3d at 307.

Indeed, Plaintiff attempts to show motives to defraud, and to support an inference of scienter, by pointing to "huge returns" generated for Citigroup by its transactions with Enron, the maximization of investment banking revenue and analysts' compensation through misleading analysis reports on the securities of Citigroup's clients, and the role of Citigroup's stock price in three stock-for-stock acquisitions undertaken during the class period. (Compl.¶¶ 443, 445, 452, 453–57.) These facts are similarly indicative of a desire to maintain the fact or appearance of corporate profitability, rather than of scienter. To plead scienter properly, the Second Circuit has held, "plaintiffs ha[ve] to allege that defendants benefitted in some concrete and personal way from the purported fraud," such as by profiting from insider sales at artificially inflated prices. *Novak*, 216 F.3d at 307–08. Plaintiff pleads no such concrete benefits distinct from general profitability of Citigroup/SSB or compensation based on corporate revenues.

Nor does Plaintiff succeed in pleading facts supporting an inference of scienter by identifying behavior that is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit*, 264 F.3d at 142 (quoting *Honeyman v. Hoyt (In re Carter–Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir.2000)). Even taking as true Plaintiff's allegations that Citigroup executives were aware of

---

5. By contrast, it is replete with allegations of complicity in schemes to hide matters from the shareholders of Citigroup's clients in connection with securities of those clients—Plaintiff's claims do not, however, arise from transactions in the securities of Citigroup clients.

6. *See* Pltf. Mem. of Law in Opp'n, at 36–37.

7. Compl. ¶ 121.

the transactions with Enron, including the prepaid swap deals, the pleading shows only a motive to maximize Citigroup profits and potential mismanagement in analyzing the risk of such transactions, rather than misuse of corporate affairs for noncorporate purposes.

The Complaint thus fails to meet the relevant pleading requirements as well as to state a claim upon which relief can be granted.

### Individual Liability

Plaintiff also fails to plead facts sufficient to hold the individual defendants liable for securities fraud. In order to satisfy the pleading requirements of Rule 9(b) and the PSLRA, a plaintiff must allege that an officer or director *"personally* knew of, or participated in, the fraud." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993) (emphasis in original). Plaintiff must allege facts with regard to each Defendant that give rise to a strong inference of fraudulent intent by showing either motive and opportunity to commit fraud or strong circumstantial evidence of conscious misbehavior or recklessness.

■ Plaintiff alleges in the Complaint that "[s]cienter can ... be inferred on the part of the defendants Weill, Thomson, and Carpenter by virtue of their high ranking positions within Citigroup and SSB," (Compl.¶ 447), and argues that the Defendants may be held liable for false statements in published reports pursuant to the "group pleading doctrine." (Pltf. Mem. of Law in Opp'n, at 39.) Although the group pleading doctrine may be sufficient to link the individual defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they

were made. *Jacobs v. Coopers & Lybrand, L.L.P.*, No. 97 CIV 3374(RPP), 1999 WL 101772, at *16–17 (S.D.N.Y. Mar. 1, 1999).

■ With regard to Defendant Weill, Plaintiff alleges that, in addition to signing Citigroup's Report on Form 10–K in 1999, 2000, and 2001, Weill personally made several false statements. Plaintiff alleges that Weill commented publicly concerning Citigroup's exposure to Enron debt, saying "we feel very comfortable about [the exposure]" and that he touted Citigroup's discipline in risk management. (Compl.¶¶ 78, 110, 112.) Because mismanagement alone cannot serve as the basis for a section 10(b) action, as discussed above, these statements about the management of Citigroup transactions are not sufficient to support a strong inference of fraudulent intent. Plaintiff also alleges that Weill personally promoted the use of the Delta/Yosemite prepaid transactions [8] and that he reviewed the Weill Memo describing the Sundance element of the Bacchus transactions.[9] (Compl.¶¶ 191, 448) Nonetheless, the Complaint is devoid of facts establishing that Weill knew such transactions to be fraudulent or that Weill consciously disregarded a known risk to Citigroup and its shareholders.

■ With regard to Thomson, Plaintiff alleges that, as the head of equity investments at Citigroup, Thomson was "aware," by virtue of his position, of Citigroup's investment as a limited partner in the Enron SPE known as LJM2. (Compl.¶¶ 449.) As with the allegations against Weill, Thomson's awareness of a particular transaction is insufficient to show that he acted with scienter. Plaintiff also cites Thomson's position as Chief Financial Officer and the fact that he signed

---

**8.** *See* discussion, *supra,* at 372–73.

**9.** *See* discussion, *supra,* at 373.

Reports on Form 10–K and 10–Q during the class period as a basis for holding him individually liable for section 10(b) violations. His position as an officer alone, however, is insufficient to support an inference of scienter. *In re Health Mgmt., Inc., Sec. Litig.,* 970 F.Supp. 192, 204 (E.D.N.Y.1997) (citing *Duncan v. Pencer,* Fed. Sec. L. Rep. (CCH) ¶ 99043, 1996 WL 19043, at *14 (S.D.N.Y. Jan. 18, 1996)).

■ Plaintiff's allegations with regard to Carpenter are largely conclusory and therefore likewise insufficient properly to plead scienter. The Complaint alleges that, by virtue of memoranda, phone calls, and e-mails he received (the contents of which are unspecified in the Complaint), Carpenter was advised about the conflicts of interest created by analysts' involvement in investment banking at SSB and was aware of risky transactions with Enron. (Compl.¶ 450.) Even if Carpenter had access to such information, Plaintiff has not alleged facts indicating that he consciously disregarded known risks (as opposed to acting negligently). *See Jacobs,* 1999 WL 101772, at *16.

■ Plaintiff also fails to state a claim against Grubman for individual liability. First, the Complaint does not allege that Grubman made any public statements during the class period. Plaintiff argues that Grubman may be implicated in various Citigroup filings by way of the group pleading doctrine, but does not allege that Grubman signed any SEC reports or other public disclosures upon which he can be held liable. Grubman was not an officer or director, but was merely an SSB analyst. Plaintiff argues, without citing legal support, that Grubman should be held individually liable simply as an "agent" of Citigroup. On the contrary, even under the group pleading doctrine, Plaintiff must allege with particularity that a defendant was an insider or affiliate who knew the group published statements were false at the time they were issued. *Jacobs,* 1999 WL 101772, at *17. Moreover, Plaintiff's argument that Grubman's scienter can be inferred from his motive to receive higher annual compensation in exchange for investment banking business must be rejected because it is the type of motive expressly held by the Second Circuit to be too generalized to satisfy the pleading requirements for scienter. (Compl.¶ 452); *Acito,* 47 F.3d at 54 ("Therefore, we hold that the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter.") Plaintiff's claims against the individual defendants, Weill, Thomson, Carpenter, and Grubman, are therefore dismissed.

*Control Person Liability*

Section 20(a) provides for control person liability, stating that "every person who 'controls' any other person found liable under the 1934 Act, 'unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.'" *Jacobs,* 1999 WL 101772, at *17 (quoting 15 U.S.C. § 78t(a)). Because Plaintiff has not established a primary violation pursuant to section 10(b), there cannot be a claim for control person liability under section 20(a). *In re Keyspan Corp. Sec. Litig.,* No. 01 CV 5852(ARR), 2003 WL 1702279, at *27 (E.D.N.Y. Mar. 21, 2003). Accordingly, the section 20(a) claims are hereby dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted in its entirety. Plaintiff's request for leave to replead is granted. Plaintiff shall file and serve a Second Amended Complaint no later than August 31, 2004. If no such amended complaint is timely served and

filed, this action will be dismissed with prejudice.

SO ORDERED.