**In re DOT HILL SYSTEMS COR-PORATION SECURITIES LITIGATION.**

**Case No. 06CV228 JLS (WMc).**

United States District Court, S.D. California.

Sept. 2, 2008.

Kara Michelle Wolke, Michael M. Goldberg, Glancy, Binkow and Goldberg, Leigh A. Parker, Weiss and Lurie, Los Angeles, CA, Philip C. Tencer, Cooley, Godward, Kronish LLP, Frank J. Johnson, Jr., Johnson Bottini, LLP San Diego, CA, Eric J. Belfi, Murray, Frank and Sailer, Ira M. Press, Kirby McInerney, LLP, New York, NY, for Plaintiffs.

Darcie Tilly, Meghan O'Ryan Spieker, Philip C. Tencer, Cooley, Godward, Kronish LLP., San Diego, CA, for Defendants.

## ORDER (1) GRANTING DEFENDANTS' MOTION TO DISMISS WITHOUT PREJUDICE and (2) GRANTING MOTION TO STAY DISCOVERY IN STATE–COURT ACTIONS

JANIS L. SAMMARTINO, District Judge.

Presently before the Court are two motions by Dot Hill Systems Corporation, James L. Lambert, Dana W. Kammersgard, Preston S. Romm, and William R. Sauey[1] ("defendants"). Defendants move to dismiss plaintiffs' second amended consolidated class action complaint ("SACC"). (Doc. No. 73.) Pursuant to the Securities Litigation Uniform Standards Act ("SLUSA"), defendants also move for this Court to stay discovery in two state-court actions: *In re Dot Hill Systems Corp. Derivative Litigation,* San Diego County Superior Court Case No. GIN05287, and *Brody v. Dot Hill Systems Corp., et al.,* San Diego County Superior Court Case No. 37–2007–00073096–CU–SL–CTL. The Court grants the motion to dismiss with leave to amend, and grants the motion to stay discovery.

1. The individual defendants held the following roles during the relevant period: Lambert—founder, director, Chief Executive Officer, President, Chief Operating Officer, Vice—Chairman of Board; Kammersgard—Chief Technical Officer, President, and Chief Executive Officer; Sauey—founder and director; and Romm—Chief Financial Officer and Treasurer. (SACC ¶¶ 19–22.)

## BACKGROUND

### A. Facts

Lead plaintiffs bring this putative class action on behalf of all purchasers of Dot Hill common stock between April 23, 2003 and April 27, 2006. (SACC ¶ 1.)

Dot Hill provides data storage devices (*i.e.,* hard drives), both as stand-alone units and as part of larger storage systems. (SACC ¶ 2.) Dot Hill's devices employ Redundant Array of Independent Disks ("RAID") technology. (*Id.*) In 2002, facing severe declines in sales and revenue, Dot Hill restructured its business by outsourcing its manufacturing, transitioning to an indirect sales model, and sharply reducing sales and administrative personnel. (*Id.* ¶ 3.) That same year, Dot Hill secured a contract to provide data storage systems to Sun Microsystems, which became the source of 80–90% of Dot Hill's quarterly revenues. (*Id.* ¶ 4.)

In September 2003, Dot Hill completed a secondary stock offering that raised approximately $154 million, with the individual defendants selling an additional $23.1 million. (SACC ¶ 6.) Dot Hill used some of the revenues from this offering to purchase Chapparal Network Storage, Inc., a provider of RAID technology, with the intent of integrating Chapparal technology into its own products. (*Id.* ¶ 7.) Dot Hill's share price increased from $6 at the start of the class period to a peak price of $18, dropped by half in 2004 and early 2005, eventually declined to $4.55 on April 28, 2006 and then subsequently declined to $3 per share. (*Id.* ¶ 12.)

The SACC alleges five sets of misrepresentations giving rise to plaintiffs' claim for federal securities fraud. First, plaintiffs allege that Dot Hill conceded the material falsity of its financial statements for the first 3 quarters of 2004. (SACC ¶ 29.) In a February 3, 2005 press release, Dot Hill acknowledged "internal control deficiencies that constitute material weaknesses" and attributed those deficiencies to outdated software and inadequate accounting resources. (*Id.*) Dot Hill repeated the admission of "a material weakness in [its] internal control" via its amended Form 10–Q and 2004 Form 10–K, both filed on March 16, 2005. (*Id.* ¶ 30). The SACC alleges that Dot Hill's management knew of the shortcomings in its accounting software, as revealed through the "common knowledge" of employee complaints and conversations between employees and the executive defendants. (*Id.* ¶¶ 37–38.) Also, the management was allegedly aware of understaffing in the accounting department because of the long hours worked by those employees, the problems with late payments, and the absence of staff with adequate credentials. (*Id.* ¶ 40.)

Second, plaintiffs allege misrepresentations pertaining to the progress of Dot Hill's acquisition of Chapparal technology. Defendants continued to represent that the integration of Chapparal technology into Dot Hill products was "on schedule" and "continuing smoothly," although defendants continually pushed back the expected target date for shipping those products. (SACC, *e.g.,* ¶ 50.) Allegedly, the integration of the technology was progressing more slowly, with the delivery of products to market more remote than Dot Hill was representing. (*Id.* ¶ 54.) Dot Hill management allegedly must have known about these delays in the Chapparal integration because Kammersgard, Dot Hill's Chief Technology Officer, kept aware of issues in Dot Hill's product development and spoke with employees in those divisions of the company. (*Id.* ¶ 57.)

Third, plaintiffs allege misrepresentations associated with defendants' remarks about the salutary effects of staff cuts and its business model predicated on outsourced manufacturing and indirect sales. Dot Hill particularly emphasized its annualized revenue figure of more than $1 million per employee. (SACC ¶¶ 61–64.) Dot Hill further represented its expectation that it would continue to operate with fewer than two hundred employees. (*Id.* ¶¶ 60, 62.) These representations were allegedly false because Dot Hill's business model, rather than making the company sustainably profitable, "had resulted in organizational dysfunction and breakdown." (*Id.* ¶ 66.) By this statement, plaintiffs mean to refer to Dot Hill's inadequate accounting personnel and inexperienced sales staff. (*Id., e.g.,* ¶¶ 66–67.) Plaintiffs attribute these shortcomings to defendants' insistence on maintaining per-employee revenue levels above $1 million. (*Id.* ¶ 69.) Plaintiffs allege that defendants' representations of "a 'lean' or 'efficient' organization" in 2003–04, including its representations of profits earned during those periods, were effectively false because, if Dot Hill had maintained operating costs and employee headcount at sustainable levels during that period, its financial results would have been much worse. (*Id.* ¶¶ 72, 75.) Dot Hill's results in subsequent years were much worse because the company incurred operating costs associated with hiring more accountants and upgrading software and because the incompetent sales force could not secure new customers. (*Id.* ¶¶ 67, 77.)

Fourth, plaintiffs allege that defendants provided unduly optimistic representations concerning Dot Hill's relationship with Sun Microsystems, its largest customer. These positive statements included Dot

Hill's commitment to making the relationship with Sun successful, along with announcements of extensions of the Sun–Dot Hill contract. (SACC ¶¶ 80, 91.) Plaintiffs allege these statements were false because Sun was actually dissatisfied with Dot Hill's services and "enjoyed a structurally superior position in the relationship that allowed it to dictate terms to Dot Hill[.]" (*Id.* ¶ 93.) Specifically, plaintiffs allege that Dot Hill acquired Chapparal because Sun demanded that Dot Hill acquire a new source of RAID technology. (*Id.*) And, the announcements of the contract extensions were allegedly misleading because they failed to disclose the "punitive" terms that Sun imposed on Dot Hill. (*Id.* ¶ 94.) The alleged truth finally came to light on April 28, 2006, when Dot Hill disclosed that Sun had awarded a product development contract to one of Dot Hill's competitors. (*Id.* ¶ 95.)

Fifth and finally, plaintiffs allege that defendants misrepresented the extent of their success in attracting new customers. These misrepresentations included press releases announcing "agreements" with third parties because those agreements did not require purchases of Dot Hill products and often failed to generate much revenue. (SACC, *e.g.*, ¶¶ 98, 109.) Defendants alleged knew of the falsity of these misrepresentations because defendants were aware of their underqualified sales staff and inadequate investment in business development. (*Id.* ¶¶ 110–11.)

## B. Procedure

The SACC pleads two causes of action for (1) violation of Exchange Act § 10(b) and Rule 10b–5, and (2) controlling person liability under Exchange Act § 20(a).

The Hon. Thomas J. Whelan reassigned the action to this Court on September 25, 2007. At the time, a fully briefed motion to dismiss the SACC was pending for decision. (Doc. No. 58.) On November 28, 2007, the Court granted the parties' joint motion to stay the litigation pending mediation. (Doc. No. 66.) On February 28, 2008, the parties filed a joint report informing the Court that they could not agree to settlement terms and requesting that the Court set the motion for hearing. (Doc. No. 67.)

The Court held a telephonic status conference on March 5, 2008. In light of recent Supreme Court case law, the parties agreed to vacate defendants' motion to dismiss without prejudice. The Court vacated the motion and set a briefing schedule on the forthcoming renewed motion on March 14, 2008. (Doc. No. 72.)

Defendants refiled their motion to dismiss the SACC on May 1, 2008.[2] (Doc. No. 73.) Plaintiffs filed their opposition on June 19, 2008. (Doc. No. 74.) Defendants replied on July 24, 2008. (Doc. No. 78.)

Defendants filed their motion to stay state-court discovery on July 11, 2008. (Doc. No. 76.) Plaintiffs from the state-court derivative action specially appeared to oppose the motion to stay on July 28, 2008. (Doc. No. 80.) The plaintiff in the *Brody* state-court action never appeared in this action to oppose the motion to stay. Defendants filed their reply on August 7, 2008. (Doc. No. 82.)

The Court held oral argument on the motion to dismiss and the motion to stay on August 14, 2008. The Court then took the matters under submission, and announces its decision *infra.*

**2.** Plaintiffs' motion to dismiss included a request for judicial notice of certain documents. The Court grants that request to the extent the Court explicitly cites those documents *post,* and denies the request as moot for all documents not explicitly cited.

## DISCUSSION

### A. Motion to Dismiss

#### 1. Legal Standard

To survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.* at 1965 (internal citations omitted). In reviewing the motion to dismiss, the Court must assume the truth of all factual allegations and construe inferences in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.2001).

A plaintiff "must state with particularity the circumstances constituting fraud[.]" Fed.R.Civ.P. 9(b). Pursuant to the Private Securities Litigation Reform Act ("PSLRA"), the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Therefore, plaintiffs must specifically identify the allegedly fraudulent statements or acts of fraud. *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994). And, plaintiffs must plead evidentiary facts including the dates, times, places, and persons associated with each misrepresentation or act of fraud. *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548–49 n. 7 (9th Cir.1994) (*en banc*) (superseded by statute on other grounds); *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir.1993).

The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Therefore, plaintiffs must also plead scienter with particularity. *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir.2001); *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F.Supp.2d 1083, 1099 (C.D.Cal.2008). Plaintiffs "must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir.1999). Recklessness amounts to " 'an extreme departure from the standards of ordinary care, and . . . presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 389 (9th Cir.2002) (quoting *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990)). Liability for forward-looking statements, however, attaches only if plaintiff can prove that the statement was made with actual knowledge of its falsity.[3] 15 U.S.C. § 78u–5(c)(1)(B); *No. 84 Employer–Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir.2003). As recently prescribed by the Supreme Court, to determine the strength of a scienter inference, this Court "must consider plausible nonculpable explanations for the defendants' conduct, as well as inferences favoring the

---

**3.** Besides applying this legal rule, the Court declines to address defendants' arguments concerning the PSLRA's "safe harbor" provision (*see* Memo. ISO MTD, at 29–31), in light of the Court's decision to grant the motion to dismiss in its entirety.

plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007). The complaint survives "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510.

Courts within the Ninth Circuit combine the falsity and scienter pleading requirements into a single inquiry, such that " 'the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.' " *In re Read–Rite Corp.*, 335 F.3d 843, 846 (9th Cir.2003) (quoting *Ronconi*, 253 F.3d at 432).

When plaintiffs base their allegations on information and belief, "[i]t is not sufficient ... to set forth a belief that certain unspecified sources will reveal ... facts that will validate [plaintiffs'] claim." *Silicon Graphics*, 183 F.3d 970 at 985; *In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1023 (S.D.Cal.2005). Although a complaint may keep confidential the identities of personal sources, those confidential witnesses "should be 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.' " *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir.2004) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000)); *Alaska Elec. Pension Fund v. Adecco S.A.*, 371 F.Supp.2d 1203, 1211 (S.D.Cal.2005). A complaint relying on anonymous confidential witnesses must also contain "adequate corroborating details." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir.2005); *Adecco*, 371 F.Supp.2d at 1211. Such details might include job descriptions, work responsibilities, position titles, and corporate executives to whom the witnesses reported. *Daou Sys.*, 411 F.3d at 1016. To determine the adequacy of allegations based on confidential witness accounts, the court evaluates " 'the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of the sources, [and] the reliability of the sources.' " *Id.* at 1015 (quoting *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29 (1st Cir.2002)); *Limantour v. Cray Inc.*, 432 F.Supp.2d 1129, 1141–42 (W.D.Wash.2006).

Also as part of a securities fraud claim, plaintiffs must plead " 'loss causation,' *i.e.*, a causal connection between the material misrepresentation and the loss[.]" 15 U.S.C. § 78u–4(b) (4); *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In other words, "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GmbH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, at 1061, (9th Cir. July 25, 2008). "A limited temporal gap" from the revelation of the misrepresentation to the stock price decline does not invalidate the loss causation theory. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir. 2008). Without specifying whether loss causation pleading must satisfy the particularity requirements of FRCP 9(b) or simply provide the "short and plain statement of the claim" of FRCP 8(a)(2), the Ninth Circuit requires "sufficient detail to give defendants ample notice of plaintiffs' loss causation theory, and to give [the court] some assurance that the theory has a basis in fact." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989–90 (9th Cir.2008).

When dismissing a complaint, the Court may deny leave to amend only if it appears with certainty that the plaintiff cannot state a claim and any amendment would be futile. *See* Fed.R.Civ.P. 15(a) (stating leave to amend "shall be freely given when justice so requires"); *DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir.1992); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.,* 806 F.2d 1393, 1401 (9th Cir.1986).

#### 2. Discussion
##### a. Falsity/Scienter
###### I. FIVE SPECIFIC CATEGORIES OF MISREPRESENTATIONS

The Court finds that all five sets of plaintiffs' allegations fail the Ninth Circuit's pleading standard for falsity and scienter.

■ First, although defendants concede the falsity of their interim financial statements (Memo. ISO MTD, at 13 n. 2), plaintiffs have not pled facts establishing defendants' recklessness (much less actual intent) in making those statements at the time the financial statements were issued. All of plaintiffs' scienter allegations concern defendants' alleged knowledge of inadequacies in the accounting software and personnel deficiencies in the accounting department. (SACC ¶¶ 37–40.) None of the alleged misrepresentations in the financial statements, however, pertained to the adequacy of defendants' accounting software or the qualifications of its accounting department. To survive a motion to dismiss, plaintiffs must plead defendants' scienter of the misrepresented figures in its financial statements (*i.e.,* the misstated revenue, cost of goods sold, and various expenses). Allegations of defendants' incompetent accounting do not provide the requisite particularity for a claim predicated on a misrepresentation of company earnings. *Daou Sys.,* 411 F.3d 1006, 1016 (9th Cir.2005) (citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 203–04 (1st Cir.1999)). Considering the allegations regarding defendants' knowledge of the condition of Dot Hill's financial department, the Court finds that plaintiffs have not pled "a strong circumstantial case of deliberate recklessness or conscious misconduct" in the filing of false financial statements. *See DSAM Global Value Fund,* 288 F.3d at 390.

■ Second, concerning the progress of the Chapparal acquisition, plaintiffs claim that defendants made actionable statements that the acquisition was proceeding "very well" and was "already a success," such that the integration of RAID technology into Dot Hill's products was "on schedule and continuing smoothly." (Opp. to MTD, at 9 (citing SACC ¶¶ 46–49).) At best, plaintiffs fail to provide an adequate explanation of the reasons why these statements are misleading. Plaintiffs simply disagreed with defendants about how quickly the integration should have been accomplished. At worst, plaintiffs are predicating their claim on mere puffery, *i.e.,* statements that are "so 'exaggerated' or 'vague' that no reasonable investor would rely on the statement when considering the total mix of available information." *In re Metawave Commc'ns Corp. Sec. Litig.,* 298 F.Supp.2d 1056, 1090 (W.D.Wash.2003) (citing *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 200–01 (3d Cir.1990)); *see In re Splash Tech. Holdings, Inc. Sec. Litig.,* 160 F.Supp.2d 1059, 1076–77 (N.D.Cal. 2001) (dismissing as non-actionable puffery references to, *e.g.,* "strong" demand, "better than expected" or "robust" results, and an "improved" product line).

Even if plaintiffs could establish that these statements about Chapparal were actionably misleading, plaintiffs have not

adequately pled scienter. Plaintiffs cite a February 3, 2005 conference call in which Lambert admitted that Dot Hill had not yet shipped products with Chapparal technology and could not guarantee the quarter when those products would actually be released, although their arrival was promised within the year. (SACC ¶ 55.) Plaintiffs also cite confidential witnesses in the sales/marketing departments who stated that Dot Hill did not develop a finished device by the end of the class period. (*Id.* ¶ 56.) Finally, plaintiffs claim Dot Hill's awareness of these product development problems because Kammersgard, in his capacity as the Chief Technology Officer, kept track of these issues. (*Id.* ¶ 57.) None of these allegations, however, establish Dot Hill's deliberate recklessness concerning its statements about the Chapparal integration when those statements were made. Nor do these allegations establish Dot Hill's actual knowledge of the falsity of its forward-looking projections when products with Chapparal technology would reach the market. Indeed, the allegations are not even close to providing the "specific facts" necessary to establish scienter. In support of the allegations of Kammersgard's knowledge, the SACC relies on two confidential witnesses: a Chapparal executive who recalls that Kammersgard visited the Chapparal facility prior to the Dot Hill acquisition and asked a few questions, and a Dot Hill sales manager who credited Kammersgard as the "driving force" in the Chapparal acquisition. (*Id.* ¶ 57.) Neither confidential witness makes an allegation relevant to what Dot Hill knew in 2004 and 2005 about the progress of the Chapparal integration after the acquisition.

■ As currently pled, there is simply no false statement in defendants' third set of representations about its operating structure. Dot Hill accurately represented its low employee headcount and high levels of revenue per employee. Plaintiffs attempt to survive the motion to dismiss by casting their allegations as the omission and misrepresentation of defendants' mismanagement. For this proposition, they erroneously rely on *No. 84 Employer–Teamster Joint Council Pension Trust Fund.* In that distinguishable case, the defendant airline suffered stock declines after experiencing what the Federal Aviation Administration ("FAA") described as "a systematic problem" with aircraft maintenance. 320 F.3d at 926. Although these maintenance problems continued (with the accompanying FAA warnings and enforcement actions), the airline actively misrepresented that it had fixed the maintenance problems and was achieving improved results because of efficient management. *Id.* at 927. Here, by contrast, plaintiffs allege that defendant should have anticipated its inability to sustain high revenues in the future with a significantly downsized workforce. The confidential witnesses presented in support of plaintiffs' scienter allegations do not establish defendants' deliberate recklessness or actual knowledge of the future effects of a leaner business model. Instead, these confidential witnesses present a litany of employee complaints about how Dot Hill was managed during the relevant period. If anything, Dot Hill management's belief that it could sustainably operate the company with such a low employee headcount represents a "momentary surplus of hubris," far below the requisite scienter for pleading a securities fraud claim. *See In re Guess? Inc. Sec. Litig.,* 174 F.Supp.2d 1067, 1078 (C.D.Cal.2001).

■ The fourth set of allegedly false statements concerning Dot Hill's relationship with Sun are problematic for a variety of reasons. Most of these statements amount to non-actionable puffery, speaking vaguely of an "excellent relationship,"

"highly positive and mutually beneficial" interactions, "a success," etc. Plaintiffs fail to explain persuasively why Dot Hill was legally required, in the face of such generalized comments, to disclose the specific obstacles in the Sun–Dot Hill relationship. Plaintiffs also fail to allege why these obstacles rose to such a magnitude that the business relationship was "an atypical one made extremely poor and precarious for Dot Hill by its near-total reliance on Sun." (Opp. to MTD, at 12.) Plaintiffs give the Court no idea of how it should measure a "typical" business relationship versus an "atypical" relationship nor how much disparity in bargaining power must exist before one party is required to disclose its inferior position anytime it says something positive about the relationship.

Inferences of scienter are not as compelling as alternative, nonculpable explanations for defendants' conduct. The Chapparal acquisition, for example, does not provide evidence of Sun's irreparable dissatisfaction with Dot Hill's products. Instead, it suggests Dot Hill's bona fide commitment to strengthening its relationship with its largest customer. Similarly, the frequent ongoing interaction between Sun and Dot Hill employees over a period of several years suggests a sufficiently functional relationship to support the truth of defendants' description of that relationship.

 To the extent that plaintiffs predicate their fourth set of allegations on misrepresentations in press releases announcing extensions of the Sun—Dot Hill contract, those purported misrepresentations were qualified by adequate risk warnings within the same press releases. Dot Hill's warnings disclosed the risks that Sun could reduce its business or terminate the agreement, and was not obligated to purchase all (or any) of its stor-

age devices from Dot Hill. (Tencer Decla. ISO MTD, Exhibit G (January 28, 2004 press release), at 309, & Exhibit H (October 26, 2005 press release), at 356.) Disclosing the precise risks at issue " 'negate[s] an inference of scienter.' " *In re Wet Seal, Inc. Sec. Litig.,* 518 F.Supp.2d 1148, 1165 (C.D.Cal.2007) (quoting *In re Worlds of Wonder Sec. Litig.,* 35 F.3d 1407, 1425 (9th Cir.1994)).

 Fifth and finally, the Court finds defects in plaintiffs' falsity and scienter allegations concerning defendants' statements about attracting new customers. Plaintiffs simply fail to identify with sufficient particularity the precise misrepresentations amidst eleven lengthy paragraphs (SACC ¶¶ 97–108) filled with block quotations of fuzzy statements about Dot Hill's prospects of developing new customers. For example, plaintiffs do not specify whether Dot Hill announced an agreement that did not exist, claimed to reach out to specific categories of customers that it actually ignored, or affirmatively represented that its employees possessed certain levels of qualifications which they did not have. Plaintiffs' citation to *Daou Systems* is distinguishable because, in that case, the defendant claimed to have implemented a "Daou University" program for teaching technical skills and training university students. 411 F.3d at 1020. However, the *Daou* plaintiffs specifically pled that "Daou University" did not exist, and, beyond that, plaintiffs represented that the actual rate of employee turnover was five or six times the figure cited in defendants' misrepresentations. *Id.* at 1020–21. The *Daou Systems* court cited a case wherein the Ninth Circuit affirmed the dismissal of allegations that the defendant failed to "adequately train" its employees, hire "sufficient numbers" of personnel, or prevent "a substantial percentage" of employees from quitting. *Id.* at 1021 (citing *In re*

*Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1086–87 (9th Cir.2002)). Right now, the SACC looks much more like the dismissed allegations of *Vantive Corporation* and simply does not resemble the specifically pled claims in *Daou Systems.*

■ To the extent that plaintiffs also allege falsity in the announcements of new customer agreements, those statements are unsupported by any relevant scienter allegations. Plaintiffs allege those announcements were false because, *inter alia*, they did not produce much actual revenue for Dot Hill. (SACC ¶ 109.) Nonetheless, plaintiffs' scienter allegations fail to address what defendants knew about the level of revenue those agreements would (or would not) produce at the time Dot Hill entered those agreements. Instead, the scienter allegations amount to qualitative criticism of the caliber of Dot Hill's sales force and the level of investment allocated to sales/marketing. They reflect generalized employee discontent with Dot Hill's management, rather than establishing the falsity of specific representations pertaining to particular new customer agreements. As recognized by federal courts nationwide, allegations of mismanagement are not actionable in securities fraud cases. *E.g., Field v. Trump*, 850 F.2d 938, 947–48 (2d Cir.1988); *In re BellSouth Corp. Sec. Litig.*, 355 F.Supp.2d 1350, 1373 (N.D.Ga.2005); *In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367, 375–78 (S.D.N.Y.2004); *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 127 F.Supp.2d 734, 748 (D.Md.2001). Because of the absence of relevant scienter allegations, the Court distinguishes the out-of-circuit authority allowing plaintiffs to proceed based on material omissions in press releases announcing corporate agreements but failing to disclose the absence of exclusivity and minimum purchase requirements in those agreements. *See Brumbaugh v. Wave*

*Sys. Corp.*, 416 F.Supp.2d 239, 246–47, 252–54 (D.Mass.2006).

### II. GENERALIZED SCIENTER ALLEGATIONS

■ In addition to scienter allegations for each set of misrepresentations, plaintiffs also include more generalized scienter allegations relevant to the entire SACC. These generalized allegations are equally unavailing. The insider trading allegations are problematic because the insider sales in September 2003 preceded the vast majority of the alleged misrepresentations. In reviewing plaintiffs' list of misrepresentations made before that date (*see* Opp. to MTD, at 25), the Court finds that many of these paragraphs contain no actual representations, cite representations which were factually true, and/or pertain to representations made after the September 2003 sales. Therefore, as currently pled, the individual defendants did not trade stock "at times calculated to maximize personal benefit from undisclosed inside information." *Ronconi*, 253 F.3d at 435; *see Vantive Corp.*, 283 F.3d at 1093 (finding no suspicious timing when stock sales made over a year before press release on which lawsuit was based).

The Ninth Circuit has firmly established that "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient." *Daou Systems*, 411 F.3d at 1022; *In re Ligand Pharm., Inc. Sec. Litig.*, 2005 WL 2461151, at *14 (S.D.Cal. Sept. 27, 2005). Therefore, the Court finds unpersuasive the scienter allegations related to Dot Hill's small size and involved managers. The prolix confidential witness statements do not salvage these allegations, because they do not allege defendants' specific involvement in the subject matter of the misrepresenta-

tions. *Cf. Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, at *11–*12 (C.D.Cal. July 1, 2008) (holding that scienter was adequately pled because defendants actively monitored revenue reporting and the complaint detailed the specific ways individual defendants kept track of the company's weekly revenue).

Related to allegations of hands-on management, plaintiffs ask the Court to infer scienter from defendants' express admissions that the subjects of the alleged misrepresentations were Dot Hill's top priorities during the class period. (*See, e.g.,* SACC ¶¶ 86, 122.) Plaintiffs invoke the inference adopted by several district courts within the Ninth Circuit that " 'facts critical to a business's core operations or an important transaction are known to a company's key officers.' " *South Ferry LP No. 2 v. Killinger,* 399 F.Supp.2d 1121, 1139 (W.D.Wash.2005) (quoting *In re Northpoint Commc'ns Group, Inc. Sec. Litig.,* 184 F.Supp.2d 991, 998 (N.D.Cal. 2001)). However, the application of this rule presupposes the adequate pleading of the misrepresentation of facts concerning Dot Hill's primary areas of emphasis. Plaintiffs have not adequately pled the factual misrepresentations; therefore, the Court does not apply the inference.

Finally, management departures contemporary with major drops in the stock price "are not in and of themselves evidence of scienter." *In re Cornerstone Propane Partners, L.P.,* 355 F.Supp.2d 1069, 1093 (N.D.Cal.2005). Therefore, the Court finds inadequate the purported inference of scienter created by executive departures before a press release announcing the award of the Sun contract to another provider. (*See* SACC ¶ 125.)

#### b. Confidential Witnesses

The failure of plaintiffs' falsity and scienter pleadings stems largely from the inadequacy of the confidential witness allegations. Rather than evaluate the problems with the confidential witness allegations particular to each set of misrepresentations, the Court identifies general flaws pertinent to all the allegations.

Plaintiffs lose the argument that, because Dot Hill is a small company, they can avoid describing their confidential witnesses with particularity. The Court has found no precedent in the law of federal securities fraud allowing *in camera* review of details about confidential witnesses (as plaintiffs propose) instead of pleading those details within the complaint. *See Silicon Graphics,* 183 F.3d at 983 n. 12 (affirming district court's exclusion of *in camera* filing that "described sources with the requisite specificity" because the filing "was inappropriate and unsupported by authority"). The Court does not strictly require that plaintiffs plead the exact dates of each confidential witness's employment because district courts within the Ninth Circuit admittedly disagree on whether that information must appear in the complaint. *Compare In re SeeBeyond Techs. Corp. Sec. Litig.,* 266 F.Supp.2d 1150, 1159 (C.D.Cal.2003) ("the exact dates of employment [ ] would significantly erode the confidentiality of these sources") *with Limantour,* 432 F.Supp.2d at 1143 (describing as "fatal flaw" the failure to provide dates of employment). Nonetheless, to survive the motion to dismiss, plaintiffs *must* give the Court more information of some type to satisfy the Ninth Circuit's standard of "support[ing] the probability that a person in the position occupied by the source would possess the information alleged" and provide "adequate corroborating details" of the confidential witnesses' knowledge. As presently pled, the job descriptions (*e.g.,* "salesperson," "marketing employee," "buyer") are too

vague for the Court to discern whether the confidential witness likely knows what he/she is talking about. Information about job responsibilities is virtually non-existent. Some of the confidential witness allegations seem to come from sources of questionable reliability, *e.g.*, "hallway conversations" and vague claims of common knowledge. (*See* SACC ¶ 37(f) & (i).) In these instances, plaintiffs do not give the Court the necessary information to " 'be able to tell whether a confidential witness is speaking from personal knowledge or merely regurgitating gossip and innuendo.' " *Limantour*, 432 F.Supp.2d at 1141 (quoting *Metawave Commc'ns*, 298 F.Supp.2d at 1068).

Instead of providing the specificity and particularity demanded by the PSLRA and Ninth Circuit precedents, plaintiffs resort to numerosity and verbosity in their confidential witness allegations. If one confidential witness is impermissibly vague in making an allegation, the attribution of the same vague allegation to other confidential witnesses does not cure the pleading defect. Defendants cited particularly relevant law on this point at oral argument: "a shared opinion among confidential witnesses does not necessarily indicate either falsity or a strong inference of scienter if the allegations themselves are not specific enough." *Metawave Commc'ns*, 298 F.Supp.2d at 1070; *accord City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.*, 388 F.Supp.2d 932, 945 (S.D.Ind.2005). Similarly, repetition of the same vague allegation throughout the complaint does not cure the lack of specificity.

Also, some confidential witness allegations simply have no relevance to the misrepresentation for which they purportedly establish scienter. The Court lists representative examples here.[4]

—In ¶ 40(e), plaintiffs cite Confidential Witness 7, an engineer, for the proposition that Dot Hill was "generally understaffed". This allegation is imprecise as to time ("during the previous five years") and does not explain why an engineer would be in the position of knowing the staffing situation throughout the company. In the context of an allegation that the accounting department was so understaffed that defendants knew about misrepresentations in Dot Hill's financial statements, the general staffing situation throughout the company is irrelevant.

—In ¶ 57(b), plaintiffs cite Confidential Witness 24 for the proposition that defendant Kammersgard "was the driving force for the Chapparal acquisition[.]" Plaintiffs offer this allegation to support their claim that Kammersgard stayed up-to-date on matters of Dot Hill's product development. However, allegations regarding his participation in a corporate acquisition have no bearing on whether Kammersgard continued to monitor products developed after the acquisition.

—In ¶ 93(e), plaintiffs cite Confidential Witness 15, a sales employee who left Dot Hill because of the failure to develop a storage device integrating Chapparal technology. This allegation might be relevant to the second set of misrepresentations concerning the development and target release date of Chapparal products. However, plaintiffs do not explain the relevance of this paragraph to allegations of Dot Hill's troubled, unequal relationship with Sun Microsystems (where it currently appears in the SACC)

4. The Court emphasizes the selection of *representative* examples, rather than an all-inclusive list. If plaintiffs choose to amend their complaint, plaintiffs must review the defects identified in these representative examples and apply those principles to cure the same defects in other confidential witness allegations not enumerated here.

—In ¶ 110(a), plaintiffs cite Confidential Witness 12, "a salesperson who was employed briefly by Dot Hill ... [and] recalled that Dot Hill did not seem to have many salespersons[.]" This paragraph does not identify the periods of employment, nor does it explain the witness's basis for the claim of "not ... many salespersons[.]" Confidential Witness 12's allegation is so vague as to lack relevance.

For all these reasons, plaintiffs must amend to provide greater detail about the confidential witnesses, more specific statements of what they are alleging, and a closer relationship between each allegation and the misrepresentation to which it pertains.

#### c. Loss Causation

■ The Court dismisses plaintiffs' loss causation allegations with respect to the second, third, and fifth sets of misrepresentations.

With respect to the Chapparal allegations, the Ninth Circuit recently emphasized "the complaint must allege that the practices that the plaintiff contends are fraudulent were revealed to the market and caused the resulting losses." *Metzler Inv. GmbH*, 2008 WL 2853402, at *9; *see In re Avista Corp. Sec. Litig.*, 415 F.Supp.2d 1214, 1220 (E.D.Wash.2005) (explaining that plaintiff cannot argue for adequate pleading of loss causation when plaintiffs specifically allege that the misrepresentations have not been disclosed). Plaintiffs claim that Dot Hill revealed its failure to integrate Chapparal technology in the February 2005 announcement of the financial restatement.[5] (*See* SACC ¶ 12.)

Taking judicial notice of that press release,[6] however, the Court could find no disclosure of *any* information concerning the progress of the Chapparal integration. (*See* Tencer Decla. ISO MTD, Exhibit H, at 336–43.) Furthermore, the SACC contradicts the argument of disclosure in the February 2005 announcement because the SACC pleads that Dot Hill continued to misrepresent its progress in the Chapparal integration through conference calls on April 27 and July 27, 2005. (SACC ¶¶ 52–53.)

With respect to the business model misrepresentations, plaintiffs cannot survive the loss causation inquiry because, as explained *supra*, plaintiffs have not adequately pled the existence of a misrepresentation pertaining to headcount and revenue per employee. Where there is no misrepresentation, there can be no link between that fictional misrepresentation and plaintiffs' loss. *Dura Pharm.*, 544 U.S. at 342, 125 S.Ct. 1627.

Finally, with respect to the new customer misrepresentations, the SACC impermissibly seeks to have its allegations both ways. The SACC claims that plaintiffs' economic loss took place in 2004 as "the market increasingly began to suspect ... that Dot Hill would remain a one-trick pony dependent almost wholly on sales to Sun." (SACC ¶ 129; *accord* ¶ 121.) However, many of Dot Hill's representations concerning the outreach to new customers and formation of agreements with those customers also took place in 2004, or later. (*Id.* ¶¶ 98(g)-(h), 102–108.) As the misrepresentations continued throughout the period in which plaintiffs allegedly discover-

---

5. Two other paragraphs cited at oral argument (76 and 129) contain no allegations relevant to loss causation and the Chapparal misrepresentations.

6. The authority for taking judicial notice of public documents referenced in the complaint

is well-established. *Fecht v. Price Co.*, 70 F.3d 1078, 1080 n. 1 (9th Cir.1995); *Glenbrook Capital Ltd. P'ship v. Kuo*, 525 F.Supp.2d 1130, 1137 (N.D.Cal.2007); *In re Homestore.com, Inc. Sec. Litig.*, 347 F.Supp.2d 814, 817 (C.D.Cal.2004).

ed the fraud, plaintiffs fail to point to any disclosure that defendants' ongoing misrepresentations were fraudulent. At the motion to dismiss phase, the Court may reject this "facially implausible" theory of loss causation. *See Gilead Scis.*, 536 F.3d at 1057.

### d. Exchange Act § 20(a)

 Because plaintiffs have entirely failed to plead a viable cause of action under Exchange Act § 10(b), the Court properly dismisses plaintiffs' second cause of action for a violation of Exchange Act § 20(a), 15 U.S.C. § 78t. "To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act." *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999); *Ligand Pharm.*, 2005 WL 2461151, at *20 n. 16. In light of plaintiffs' failure to plead § 10(b) liability adequately, the Court declines to reach defendants' argument that plaintiffs failed to plead sufficiently the elements of a § 20(a) claim.

### e. Leave to Amend

Finding that justice so requires, the Court will grant plaintiffs leave to amend and deny defendants' request to dismiss the SACC with prejudice.

## B. Motion to Stay

 The PSLRA imposes a discovery stay in private federal securities litigation during motion to dismiss proceedings. 15 U.S.C. § 78u–4(b)(3)(B) (2008)[7]; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). Subsequently, in 1998, Congress enacted the Securities Litigation Uniform Standards Act ("SLUSA"). Section 101(b)(2) of SLUSA amended the federal securities laws to empower a federal court "[u]pon a proper showing ... [to] stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph." *See* 15 U.S.C. § 78u–4(b)(3)(D). The legislative history explains that the purpose of this provision is

> to prevent plaintiffs from circumventing the stay of discovery under the [PSLRA] by using State court discovery, which may not be subject to those limitations, in an action filed in State court.... Because circumvention of the stay of discovery of the [PSLRA] is a key abuse that [SLUSA] is designed to prevent, the [House Commerce] Committee intends that courts use this provision liberally, so that the preservation of State court jurisdiction of limited individual securities fraud claims does not become a loophole through which the trial bar can engage in discovery not subject to the stay of the [PSLRA].

H.R.Rep. No. 105–640, at 17–18 (1998). In determining whether to stay state court discovery, relevant considerations include the risk of federal plaintiffs obtaining the state plaintiff's discovery, the extent of factual and legal overlap between the state and federal actions, and the burden of state-court discovery on defendants. *In re Crompton Corp.*, 2005 WL 3797695, at *3 (D.Conn.2005); *In re Cardinal Health, Inc. Sec. Litig.*, 365 F.Supp.2d 866, 872 (S.D.Ohio 2005); *In re Gilead Scis. Sec. Litig.*, 2004 WL 3712008, at *3 (N.D.Cal. Nov. 22, 2004).

The Court finds that these considerations warrant a stay of the state-court

7. The statutory provision reads: "In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party."

*Brody* action. Mr. Brody filed the first putative securities class action against Dot Hill. (Doc. No. 1.) However, the Hon. Thomas J. Whelan selected the General Retirement System of the City of Detroit and the Police & Fire Retirement System of the City of Detroit (collectively, "Detroit Group") as lead plaintiffs. (Doc. No. 38.) Judge Whelan correspondingly denied Mr. Brody's motion to be appointed lead plaintiff. (Doc. No. 39.) Thereafter, Mr. Brody went to San Diego County Superior Court and filed a complaint for, *inter alia,* violations of California's statutes prohibiting misrepresentations in the sale of securities. (Tencer Decla. ISO Motion to Stay, Exhibit D, at 145.) As demonstrated by a redlined version of the Superior Court complaint, its factual allegations parrot those of Chris Jardin, a plaintiff who filed a putative class action complaint against Dot Hill in this Court[8]. (*See* Tencer Decla. ISO Motion to Stay, Exhibit F.) Based on these similarities, the Court finds substantial factual and legal overlap between the federal action and the state-court *Brody* action. Furthermore, if the *Brody* state-court action proceeds, Mr. Brody, as a federal plaintiff, will have access to discovery obtained via his state-court action. Finally, the Court concludes that allowing the *Brody* action to proceed with discovery would impermissibly burden defendants, who need not participate in discovery regarding securities fraud claims until the federal plaintiffs survive the motion to dismiss or the consolidated class action complaint is dismissed with prejudice. *See In re DPL Inc., Sec. Litig.,* 247 F.Supp.2d 946, 950 (S.D.Ohio 2003) (citing *Lapicola v. Alternative Dual Fuels, Inc.,* 2002 WL 531545, at *1 (N.D.Tex. Apr. 5, 2002)). In summary, to aid the Court's jurisdiction under the PSLRA to determine the legal sufficiency of plaintiffs' complaint prior to discovery relevant to the allegations of that complaint, the Court will stay discovery proceedings in the *Brody* state-court action pursuant to SLUSA § 101(b)(2).

With reference to the state-court derivative action, the specially appearing derivative plaintiffs first argue that SLUSA carves out derivative actions from its discovery stay provision. (*See* Opp. to Stay, at 6 (citing 15 U.S.C. § 78bb(f)(5)(C)).) This Court rejects this argument, following the other courts that have applied SLUSA's discovery stay provision to derivative actions. *Crompton Corp.,* 2005 WL 3797695, at *4; *Cardinal Health,* 365 F.Supp.2d at 873–74; *DPL,* 247 F.Supp.2d at 948. Even federal courts declining to stay state derivative actions have recognized their power to issue the stay under SLUSA. *E.g., In re Tyco Int'l, Ltd. Multidist. Litig.,* 2003 WL 23830479, at *3 (D.N.H. Jan. 29, 2003); *In re Cisco Sys., Inc.,* 2002 WL 32987531, at *2–*3 (N.D.Cal. Jan. 30, 2002). The specially appearing derivative plaintiffs cite a statutory provision which applies only to 15 U.S.C. § 78bb(f), the SLUSA subsection concerning the preemption of most securities fraud class actions based on state law. The definition of "covered class action" in the preemption provision has no bearing on the discovery stay provision, which expressly applies to "any private action in a State court[.]"

Recognizing Congress's intent for a liberal application of SLUSA's discovery stay provision, the Court will also stay the state-court derivative action. Although the derivative plaintiffs owe a fiduciary duty to Dot Hill and would not necessarily

---

**8.** Mr. Jardin's action (case no. 06cv341) was consolidated into the action presently before this Court. Mr. Brody's counsel in Superior Court previously represented Mr. Jardin in this Court.

intend to circumvent the PSLRA, the Court nonetheless "remains concerned that some form of discovery ... will reach Plaintiffs before this Court has decided [the] dismissal motion." *Cardinal Health,* 365 F.Supp.2d at 875. Although represented by different counsel in state and federal court, derivative plaintiffs do not deny the fact that they are members of the putative federal class. (Memo. ISO Motion to Stay, at 15.) Their receipt of discovery would violate the PSLRA. *Crompton Corp.,* 2005 WL 3797695, at *3. Although derivative plaintiffs invoked the PSLRA's "undue prejudice" exception at oral argument, the Court finds insufficient evidence of prejudice in the mere fact of the upcoming hearing on the motion to dismiss the derivative action. The parties may always request a continuance from the Superior Court until this Court lifts the stay, and, in the context of a motion already "delayed for well over a year" (Opp. to Motion to Stay, at 3), additional delay will not make a significant difference. *See In re Initial Pub. Offering Sec. Litig.,* 236 F.Supp.2d 286, 287 (S.D.N.Y. 2002) (citing cases for the proposition that delay cannot fall within the PSLRA's meaning of "undue prejudice").

Returning to the SLUSA inquiry, the Court recognizes the somewhat unique posture of the derivative litigation, *i.e.,* the determination whether the directors on Dot Hill's special litigation committee were independent and disinterested and made a reasonable determination in recommending the dismissal of the derivative action. The Court also recognizes that the protective order already in place in the derivative action counsels against a discovery stay. *Cf., e.g., City of Austin Police Ret. Sys. v. ITT Educ. Servs., Inc.,* 2005 WL 280345, at *10 (S.D.Ind. Feb. 2, 2005); *Gilead Scis.,* 2004 WL 3712008, at *3. Nonetheless, the derivative action arises out of overlapping factual allegations, i.e., deficiencies in Dot Hill's internal financial controls that eventually required the restatement of three quarters of financial statements. (*See* Tencer Decla. ISO Motion to Stay, Exhibit A, at 004–006.) The upcoming motion to dismiss hearing will address the special litigation's committee decision to recommend the dismissal of the complaint arising out of these overlapping facts. The motion to seal these proceedings will be heard the same date as the substantive motion itself, thus depriving defendants of the opportunity to come back to this Court to renew their motion to stay if the Superior Court denies the motion to seal. Although the Court cannot foresee exactly how the hearing on the motion to dismiss the derivative proceeding will play out, the Court recognizes the "very real possibility" that the factual overlap will force Dot Hill "to provide discovery to the [derivative] plaintiffs on matters relating directly to the claims of the plaintiffs in this case while the PSLRA discovery stay is still in effect." *Schwartz v. TXU Corp.,* 2004 WL 1732477, at *2 (N.D.Tex. July 30, 2004).

## CONCLUSION

For failure to plead falsity, scienter, and confidential witness allegations with the requisite particularity, and for failure to plead loss causation with respect to certain misrepresentation, the Court **GRANTS** defendants' motion to dismiss the second amended consolidated class action complaint **WITH LEAVE TO AMEND.** Plaintiffs **MAY FILE** a third amended consolidated class action complaint ("TACC") within thirty (30) days of the date this Order is electronically filed. If plaintiffs file a TACC, plaintiffs **SHALL LODGE** and **SERVE** a redlined copy of the TACC within five (5) business days of the electronic filing.

In aid of this Court's jurisdiction, the Court **GRANTS** defendants' motion to

**1168**

stay discovery in *In re Dot Hill Systems Corp. Derivative Litigation,* San Diego County Superior Court Case No. GIN05287, and *Brody v. Dot Hill Systems Corp., et al.,* San Diego County Superior Court Case No. 37–2007–00073096–CU–SL–CTL. The stay **SHALL REMAIN** in effect until the Court denies a future motion to dismiss the complaint in this action or grants the motion to dismiss with prejudice.

IT IS SO ORDERED.